```
             IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MARYLAND
                                    :
VANCE BYRD
                                    :
    v.                              :  Civil Action No. DKC 19-1873
                                    :
TA CHEN INTERNATIONAL, et al.
                                    :
```

**MEMORANDUM OPINION**

Presently pending and ready for resolution are Plaintiff's request for relief (ECF No. 39) and Defendants' motion for summary judgment. (ECF No. 40). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the request for relief will be denied, and the motion for summary judgment will also be denied.

**I.  Background**

The remaining dispute involves alleged retaliation against Plaintiff for the filing of a complaint with the United States Equal Employment Opportunity Commission ("EEOC") against his employer, Defendant Empire Resources, Inc ("ERI").[1]  In that

---

[1] There was some confusion over what corporate entity actually employed Plaintiff. He named Ta Chen, Inc. ("Ta Chen") as Defendant in his federal suit, whereas the EEOC complaint involved the conduct of ERI. Judicial notice was taken of the fact that Ta Chen Stainless Pipe Co., Ltd., a parent company of Ta Chen, had acquired ERI. (ECF No. 24, at 9-10); *Byrd v. Ta Chen Int'l*, No. DKC 19-1873, 2020 WL 4933636, at *4 (Aug. 24, 2020). This relationship was confirmed in the Local Rule 103.3 disclosure by

charge, Plaintiff complained of confrontations with Defendant Asher Wolf, his direct supervisor, and alleged that Mr. Wolf granted privileges to Mr. Byrd's white colleagues that he did not grant to Plaintiff and his fellow African American colleagues. The EEOC charge also alleged that Plaintiff was unfairly targeted by various forms of discipline and reprimands.  Mr. Byrd eventually was issued a "Right to Sue Letter" (ECF No. 1-3).

Plaintiff also alleges that, subsequent to the filing of the EEOC Charge, Mr. Wolf began to retaliate against him.  In particular, he alleges that various warnings he received for "insubordination" were merely pretextual.  He also asserts that Mr. Wolf began taking overtime hours away from him, and threatened Mr. Byrd's coworkers, telling them that anyone who cooperated in the EEOC case would be fired.  Plaintiff also points to purported text messages from Mr. Byrd that he asserts are proof of an attempt to "take advantage" of his lack of counsel by getting him to drop the complaint.  Ultimately, Plaintiff was terminated and told any attempted return would prompt a call to the police.

II. **Standard of Review**

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex*

---

Defendants.  Ultimately, ERI was added as Defendant and Ta Chen was dismissed.  (ECF No. 34).

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in a light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).  The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252.

In making the analysis, material in the entire record may be considered, and the question is whether admissible evidence is available to support the relevant assertion.  Fed.R.Civ.P. 56(c) states that:

> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely dispute must support the assertion by:

3

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, *or other materials*; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party *cannot produce* admissible evidence to support the fact.

(emphasis added).  As can be seen, the court has wide discretion to look at the record as a whole in adjudicating a motion for summary judgment.  The relevant question is not whether the evidence is in admissible form, but, rather, whether it is capable of being put in such a form.  Judge Bredar has explained:

> Under Fed.R.Civ.P. 56, a party making or opposing a summary judgment motion may cite to materials in the record even if they are not in admissible form—as of 2010, the standard is whether the identified facts could be put in admissible form, not whether they are in such form when submitted. *See Ridgell v. Astrue*, 2012 WL 707008, at *9 (D.Md. Mar. 2, 2012). If the opposing party believes the cited materials cannot be put in admissible form, that party "must" file an objection. *Id.*; *Herrera v. Ilhan*, 2013 WL 3177884, at *3 (D.Md. June 21, 2013) (same). Rule 56 thus contemplates a "multi-step process by which a proponent may submit evidence, subject to objection by the opponent and an opportunity [after an objection] for the proponent to either authenticate the document or propose a method to doing so at trial." *Ridgell*, 2012 WL 707008 at *9. Absent an objection, the court may simply consider the proffered evidence. *See Elat v. Ngoubene*, 993 F.Supp.2d

4

> 497, 509 (D.Md. 2014)(court will consider all evidence cited by parties absent an objection); *Niagara Transformer Corp. v. Baldwin Techs., Inc.*, 2013 WL 2919705, at *1 n.1 (D.Md. June 12, 2013) (unauthenticated exhibits attached to motion for summary judgment considered by court "as being what they purport to be" because non-movant failed to object); *see also Jones v. W. Tidwater Reg'l Jail*, 187 F. Supp. 3d 648. 654 & n.5 (E.D.Va. 2016) (considering evidence where no objection was raised and materials could be authenticated); *Lauderdale v. Wells Fargo Home Mortg.*, 552 Fed.Appx. 566, 572 (6th Cir. 2014) ("Usually, when a party fails to object to evidentiary materials submitted by the opposing party in support of summary judgment, the objections are deemed forfeited or waived."); 10A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2722 (4th ed. 2016) ("[D]ocuments inadmissible under the evidence rules may be considered by the court if not challenged").

*Kurland v. ACE Am. Ins. Co.*, No. CV JKB-15-2668, 2017 WL 354254, at *3, n.2 (D.Md. Jan. 23, 2017).

### III. Analysis

A plaintiff may prove a Title VII retaliation claim "either through direct and indirect evidence of retaliatory animus, or through the burden-shifting framework" the Supreme Court established in *McDonnell Douglas Corp, v. Green*, 411 U.S. 792 (1973). *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). . .

Under *McDonnell Douglas*, the plaintiff has the initial burden of establishing a *prima facie* case. 411 U.S. at 802. Once a *prima facie* case is established, the burden of production shifts to the defendants to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Strothers v. City of Laurel, Md.*, 895 F.3d
5

> 317, 328 (4th Cir. 2018). The defendant's burden at this point is "one of production, not persuasion." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). The plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the employer are but a pretext for discrimination, thus creating an inference that the employer did act with discriminatory intent. *Strothers*, 895 F.3d at 328. If the plaintiff cannot produce evidence demonstrating the falsity of the employer's proffered reasons, then defendants are entitled to summary judgment as a matter of law. *See Reeves*, 530 U.S. at 148 ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

*Marley v. Kaiser Permanente Found. Health* Plan, No.: 17-cv-1902-PWG, 2021 WL 927459, at *5 (D.Md. Mar. 11, 2021).

In a case relied on by Defendants, Judge Nickerson explained that, "The Fourth Circuit has held that 'direct evidence' is 'evidence that the employer announced, admitted, or otherwise unmistakably indicated that [the forbidden consideration] was a determining factor' in the challenged conduct." *Wilcoxon v. Deco Recovery Mgmt., LLC*, 925 F.Supp.2d 725, 729 (D.Md. 2013) (quoting *Stover v. Lincoln Pub., Inc.*, 73 358 (4th Cir. 1995)) (innermost internal quotation marks omitted). "Direct evidence of retaliation is evidence that demonstrates a specific link between

6

a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct." *Id.* (quoting *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011)).

The second (alternative) route allows a plaintiff to present indirect evidence to give rise to an inference of discrimination. "To prevail under the *McDonnell Douglas* framework, [the plaintiff] must first establish a prima facie case by showing: (i) 'that [he] engaged in protected activity,' (ii) 'that [his employer] took adverse action against [him],' and (iii) 'that a causal relationship existed between the protected activity and the adverse employment activity.'" *Foster v. Univ. Of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (citing *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004)).  If the employer meets that burden by offering evidence of a lawful reason for the termination, "the presumption of unlawful discrimination created by the *prima facie* case drops out of the picture[,] and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination." *Mackey v. Shalala*, 360 F.3d 463, 468 (4th Cir. 2004) (quoting *Evans v. Techs. Applications & Servs. Co.*, 80 F.3d 954, 959 (4th Cir. 1996)). Defendants argue that, "In a Title VII case where the former employer has proffered a non-retaliatory reason for its conduct towards a plaintiff, 'the Court's role is

not to substitute its judgment for that of [the employer].'" (ECF No. 40-1, at 12) (citing *Wilcoxon*, 925 F.Supp.2d at 729). Instead the production of such evidence merely shifts the burden to the Plaintiff to show, by a preponderance, that the stated reason for his termination is merely pretextual, and the real reason is discriminatory.

Defendants' motion challenges Plaintiff to satisfy his "burden to show that 'retaliation was a but-for cause' of his termination." (ECF No. 40-1, at 16) (quoting *Foster*, 787 F.3d at 252). "Plaintiff can do so by 'showing that [ERI's] proffered explanation is unworthy of credence.'" (*Id.*) (quoting *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007)). Lastly, they argue that "to be pretextual, a reason must be false and wrongful animus must be 'a but-for cause of the challenged employment action.'" (*Id.*) (quoting *Univ of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

Mr. Byrd's formal opposition is *entirely* nonresponsive to the legal arguments raised in ERI's motion. As a result, Defendants argue that Plaintiff has, in effect, conceded that no factual disputes exist as "Plaintiff fails to address any of the arguments made in Defendants' Motion." (ECF No. 43, at 1). Defendants' focus is entirely too narrow. Plaintiff explicitly references his earlier papers when he writes in opposition, "[P]laintiff submitted hard core evidence to the court that [D]efendant[s] [and]

8

the lawyers are lying." (ECF No. 42). He also filed a "Motion for Relief" (ECF No. 39) which is in essence also an opposition to the Defendants' motion.[2] These earlier filings, including the complaint and its three supplements (ECF Nos. 1, 5, 6, and 7), contain assertions of fact which are within the personal knowledge of Plaintiff. While not under oath, and thus not currently in admissible form, Plaintiff's own testimony would be admissible. Those assertions, thus, may be considered on summary judgment.

Defendants' motion correctly and succinctly summarizes Plaintiff's allegations of retaliation to date:

> In his Complaint and subsequent supplemental pleadings, Plaintiff alleges the following instances of retaliation on behalf of Defendants: (1) on or about April 2, 2019, a couple of weeks after he filed his EEOC Charge, Mr. Wolf threatened to fire Plaintiff for "insubordination[,]" ECF No. 1-4 at 2, 6; (2) on or about April 3, 2019, Mr. Wolf takes overtime hours away from Plaintiff for filing his EEOC Charge, *id.*; (3) on or about June 25, 2019, Mr. Wolf asked if one of Plaintiff's co-workers "knew anything about [his] case, or if

---

[2] Plaintiff's request for relief catalogues a series of new complaints with Defendants' actions, including various ways in which he contends that they have lied to the court. For example, Plaintiff attempts to defend his purportedly heated interaction with an outside cleaning consultant at work by explaining that he normally did the cleaning for his employer. "No other cleaning company had been to our building" before he raised his complaint against ERI, he claims, and so he felt "intimidated" by her presence. This motion also argues that "Phil," Defendants' HR representative, "made two different statements about [P]laintiff['s] termination" by initially claiming he was fired because he did not sign the "AD [anti-discrimination] policy." While the factual assertions will be considered, the motion itself will be denied as it does not request any affirmative relief.

>   he was a witness in [Plaintiff's case] because anyone involved in [Plaintiff's] case will be fired[,]" ECF No. 5-1; (4) on or about December 11, 2019, "unemployment" informed Plaintiff that he had been terminated from his job due to his refusal to "sign documents on discrimination[,]" ECF No. 18; (5) after Mr. Wolf informed Plaintiff not to return to work, Mr. Wolf advises Plaintiff via text message that despite any "hesitancy to trust [him] or anybody given what's been going on," they should both "keep things from getting confrontational there will be no reason to report anything[,]" which Plaintiff alleges Mr. Wolf's text message exchange exploits Plaintiff's mistrust of ERI in order to interfere with his EEOC Charge, *id.*; and (6) ERI terminated Plaintiff in retaliation for filing his EEOC Charge and threatened to call the police should Plaintiff return to ERI premises, ECF No. 22.

(ECF No. 40-1, at 13).

Defendants argue that Plaintiff fails to put forth direct evidence to support these claims. Mr. Wolf's declaration, which Defendants highlight in their motion, states that, "At no point in time did I": "ask to speak with Plaintiff about his Charge of Discrimination,"[3] "threaten Plaintiff with termination for cooperating in the EEOC's investigation," "threaten Plaintiff's former co-workers with termination for cooperating in the EEOC's

---

[3] Plaintiff included text messages purportedly from Mr. Wolf in a supplement to his complaint, but they do not ask Mr. Byrd to discuss his charges. Rather the messages suggest that both he and Mr. Byrd jointly "keep things from getting confrontation" so that "there will be no reason to report anything." (ECF No. 18-1, at 2). This is not direct evidence of Mr. Wolf's alleged interference with the EEOC investigation, but rather appears to be an attempt to allow the workplace to continue functioning despite it.

10

investigation," or "threaten to dock Plaintiff's pay because he filed the Charge with the EEOC."   (ECF No. 40-6, ¶¶ 18-22).

At least two of Mr. Byrd's allegations, properly considered as factual assertions, constitute direct evidence of retaliation. In Plaintiff's first supplement to his original complaint, Plaintiff refutes Defendants' rendition of an incident on June 25, 2019 (well after his initial EEOC complaint was filed) involving his co-worker and a shared cigarette.  Mr. Byrd claims that Mr. Wolf approached his co-worker at the time, removed the cigarette from his hand, and threw it away.  Despite Mr. Wolf's claims that he notified the co-worker that smoking there was an infraction, Mr. Byrd says he simply walked away after disposing of the cigarette.  In fact, Plaintiff contends, his supervisor initially apologized to him and repaid him for the cigarette (presumably once he realized it was Mr. Byrd's).  It was only later that afternoon, Mr. Byrd reports, that Mr. Wolf commented to him "since you filed a law suit[,] we will be going by the rules."  This statement, paired with the fact that he received a written warning (which he attaches to this supplement) two days later (and despite Mr. Wolf's earlier apology), is an "unmistakable indication" that Mr. Byrd's complaint was the impetus behind this adverse treatment. This same supplemental filing reports that on this same day, at 11:55 a.m., Mr. Wolf approached one of his coworkers, asked about Plaintiff's complaint, and threated termination for anyone who got

11

involved. (ECF No. 5).   While Defendants deny that Mr. Wolf made such a threat, there is a clear material question of fact as to whether these two direct forms of retaliation occurred.

Plaintiff also successfully utilizes the second route set out for him by discrimination law by highlighting a number of episodes that serve as *indirect* evidence of retaliation.  On this front, Plaintiff's factual assertions, catalogued above, suffice to make out a prima facie case of retaliation to satisfy the first step of the *McDonnell Douglas* framework; his EEOC complaint is a clear, protected activity, and he expressly alleges various forms of retaliatory conduct by Defendants that occurred after, and that were motivated by (at least primarily), the filing of this Charge. The burden of production therefore shifts to Defendants.  In turn, Defendants argue that they had multiple, legitimate grounds for firing Plaintiff. Defendants point to the declaration of Phil Herman, "Human Resources Manager," who, starting in May 2017, was "responsible for overseeing human resource functions for both TCI and ERI personnel."  (ECF No. 40-7, ¶¶ 2, 5).  He reports that, "On November 20, 2019, ERI terminated Plaintiff's employment in consideration of the November 20th Incident and three previously issued written warnings on January 16, 2019, June 27, 2019, and July 18, 2019." (*Id.*, ¶ 10).

Mr. Wolf's declaration verifies that the documents attached as Exhibits B-D to the motion each represent a "true and correct"

12

copy of these respective warning letters. (*See* ECF No. 40-6, ¶¶ 6, 10, 13). The first warning, dated January 16, 2019, put Mr. Byrd on notice that he "will be terminated unless there is improvement in your performance and/or conduct." In particular, under the "deficiencies in your performance or conduct" header, it checks the blanks for "Unacceptable Behavior" and notes "[f]requent outburst creating awkward & stressful environment for colleagues." It goes on to state, "Vance regularly challenges the authority of management in a loud distrustful way. He told me he was sent by God to tell me that I wasn't being fair to an associate." (ECF No. 40-3).

The second warning, dated June 27, 2019, contains an entirely different rendition of the June 25th cigarette incident. It notes improper conduct by Plaintiff by checking the blanks for "Misuse of Company Time," "Unacceptable Behavior," "Insubordination," and "Failure to Obey Company Rules." According to Defendants, the episode involved a "Warehouse Manager" [presumably Mr. Wolf] who put one of Mr. Byrd's colleagues on notice that he was smoking a cigarette "in an unauthorized area." Hearing this, Mr. Byrd reportedly "argued with the Warehouse Manager in a loud and disrespectful manner, interfering with the Manager in the performance of his duties." The warning goes on to tell Plaintiff that "you said the cigarette belonged to you, and that you were sharing cigarette with the other employee, which means you were

13

complicit in his smoking in an unauthorized area, if not in fact doing so yourselkf [sic] . . . ." As "[t]his is not the first time you have been . . . insubordinate towards the Manager," it states, "[b]e warned that further such interference or insubordination could result in your termination." (ECF No. 40-4).

The final warning, and the second to last incident cited by Defendants, occurred in mid-July of 2019. The "deficient" conduct here included "Time Card Violations," "Unacceptable Behavior," and "Insubordination." Specifically, this warning notes that on July 16th, Mr. Wolf was "escorting" a sales representative from a cleaning service through the "check-in office area." The representative, it states, began to take measurements for a proposal when Mr. Byrd approached and, "in a gruff, aggressive tone," asked "What's she doing?" repeatedly. Mr. Wolf reports telling him it was "none of his concern," but when he and the woman entered one of the restrooms near the office, Mr. Byrd asked, "in the same aggressive tone, audible to both the woman and myself," whether "she [was] going to clean the bathroom? We'll see about that." The report notes such "behavior is absolutely unacceptable" and reflected poorly on the company and warehouse staff. Compounding such behavior, the warning also asserts that Mr. Byrd continued addressing Mr. Wolf in an "insubordinate fashion" the next morning by saying repeatedly to Mr. Wolf "Are you going to open the door?" presumably as they were entering the premise. At

14

that point Mr. Wolf reports that he "reprimanded" Mr. Byrd and told him to go home, but he refused. Instead Mr. Byrd said, "Call the police, because that is the only way I am leaving." All three warning forms are signed by Mr. Byrd by way of acknowledgement.

The final reported confrontation between Mr. Wolf and Mr. Byrd occurred on November 20, 2019, and, while there is no attendant warning form, this encounter is detailed in Mr. Wolf's declaration.  He states that "On November 20, 2019," he "was in the process of distributing copies of ERI's Anti-Discrimination and Anti-Harassment policy" at the "Baltimore warehouse."  When given this form, "Plaintiff became belligerent and refused to sign."  He "proceeded to throw a tantrum on ERI premises, in the presence of his co-workers, and in violation of ERI's Workplace Violence policy."  Purportedly attempting to "deescalate the situation," Mr. Wolf, once again, told Mr. Byrd to go home early. He again refused, and Mr. Wolf warned him he "would be forced to call the police."  Mr. Byrd still refused, the police were called, and ultimately, they "escorted" him off the premises.  (ECF No. 40-6, ¶¶ 14-17).  Mr. Herman reports that it was for all these instances that Mr. Byrd ultimately was terminated.

Once these non-discriminatory reasons for Mr. Byrd's firing are presented, under this framework, the burden shifts to Plaintiff to put forth evidence of the "falsity of these proffered reasons."

15

*Marley*, 2021 WL 927469, at *5.  Plaintiff provides factual assertions that present such evidence.

There are numerous places were Plaintiff's assertions demonstrate material questions of fact as to conduct that, at the very least, constitutes indirect evidence of retaliation.  To begin with, Plaintiff's first supplement refutes the rendition of events in the final encounter.  While Mr. Wolf only reports Mr. Byrd's allegedly aggressive questioning of him — "Are you going to open the door?" — Plaintiff reports (presumably before this question was asked) that "GM Wolf unlocks the entrance door and stands in front of it drinking coffee blocking everyones['] entrance, *while staring at me* [] *this action cauesed* [sic] me to feel more theretned [sic] than ever."  He alleges such actions are evidence that "GM Wolf has been trying to intimidate/threaten me since I went to the EEOC to complain."  (ECF No. 5).

Plaintiff's second supplement to his complaint challenges these "write ups" more directly.  He alleges they contain "inconsistent[encies]": "one [has] a careless check box, the other don't [sic]."  While what Plaintiff means by inconsistencies is not entirely clear from this statement, is it clear that Mr. Byrd asserts that "Mr. Wolf is trying to intimidate[] and tamper with witness[es]" through these warning letters.  Moreover, Mr. Byrd asserts that in "working with Mr. Wolf [for] 5 years," he can attest to the fact that his supervisor has "never [] written [up]

16

no one[,] not even for being late." Such an assertion, if true, would create a clear and unmistakable inference that *any* warning letters directed at Plaintiff were pretextual. (ECF No. 6).

Lastly, while Mr. Wolf's declaration states that he never *threatened* to dock Plaintiff's pay, he does not refute the clear assertion in Mr. Byrd's third supplement to his complaint that he was in fact docked pay, even if such a docking was not threatened. He begins this supplement by announcing he is "[s]till being harass[ed] [as] retaliation about this lawsuit." In particular, he asserts, "Mr. Byrd work[ed] 109 hours" but received pay for only 105 hours. He contends that his employer, therefore, was "stealing time from me." As evidence that his pay was docked, Mr. Byrd attaches an earnings sheet that clearly reports his total amount of work hours for that pay period as 109.11 hours. Nonetheless, in the actual pay "earnings" section of his pay stub, only 105.8 hours are shown, and with less resultant pay. Defendants do not even *attempt* to explain away this discrepancy, and while Mr. Byrd's reference to "Vacation days" and the employer's "handbook" is hard to follow, this pay sheet and Plaintiff's attendant explanation present evidence suggesting he was, in fact, docked pay and that this constituted retaliation. Similarly, Plaintiff's original complaint accuses Mr. Wolf of docking him a day of overtime work on April 3, less than a month after his filling of the EEOC complaint, which he asserts is

17

retaliation, because "Mr. Wolf told me months ago that no one has said anything about overtime." (ECF No. 1-4, at 6).

These three supplements jointly raise a material question as to whether the events reported in the three warning letters are true overall. They also raise a material question as to whether *any* of his fellow co-workers have *ever* received similar warning letters. These letters and his ultimate termination came after his filing of an EEOC complaint, moreover, and coincided with an alleged statement by Mr. Wolf expressly acknowledging that Plaintiff was being treated differently than others because of his complaint. This is enough, if true, to give rise to an inference that retaliation was the "but-for" cause of his termination. Plaintiff also raises a material question as to whether he was docked pay at various times, also as a form of retaliation. Therefore, there is enough evidence to create a material question as to whether Defendants engaged in improper and retaliatory behavior.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment will be denied.

/s/
DEBORAH K. CHASANOW
United States District Judge
