IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VANCE BYRD                           :
                                     :
   v.                                :   Civil Action No. DKC 19-1873
                                     :
TA CHEN INTERNATIONAL, et al.        :
                                     :

**MEMORANDUM OPINION**

Vance Byrd filed this Title VII lawsuit against Ta Chen International ("Ta Chen") and several of its employees in June 2019. Ta Chen is the parent company of Mr. Byrd's former employer, Empire Resources, Inc. ("ERI"). ERI is the sole defendant remaining in this action. A three-day bench trial occurred from September 8 to September 10, 2021. The court now issues findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). For the following reasons, judgment will be entered for ERI.[1]

**I. Findings of Fact**

Vance Byrd, who ably represented himself at trial, is African-American and was employed by ERI to clean its Baltimore warehouse from August 2014 until November 20, 2019. Asher Wolf, who is white, was his supervisor. By his own telling, Mr. Byrd was the

---

[1] Asher Wolf was dismissed as a defendant during trial. Mr. Byrd's motion to amend was denied during a pretrial conference. Defendant's motion in *limine* was granted in part, denied in part, and deferred in part, during the same pretrial conference. Any further evidentiary issues were resolved during trial.

self-appointed representative to bring issues to Mr. Wolf's attention. By Mr. Wolf's telling, Mr. Byrd was a somewhat abrasive presence and a constant source of incoherent boasts and threats. Mr. Wolf nevertheless tolerated Mr. Byrd, often by ignoring his many comments, and the two maintained a relatively good and trusting relationship until March 2019. Any problems Mr. Wolf had with Mr. Byrd were dealt with informally, as they were with others.

ERI was acquired by Ta Chen in 2017 and, according to Mr. Wolf, Ta Chen gradually instituted requirements formally to document employee warnings. This change coincided with a conflict between Mr. Byrd and Mr. Wolf and a deterioration in Mr. Byrd's conduct. ERI introduced evidence that Mr. Byrd was warned about poor behavior in January, June, and July 2019 and, after another incident, fired in November 2019. Mr. Byrd acknowledged the incidents in June, July, and November but disputed that he was warned in January. He testified that Mr. Wolf threatened to fire him shortly after he filed a discrimination charge in March 2019. Mr. Wolf testified that he'd never made such threats. Aside from the bare fact that Mr. Byrd filed a charge of discrimination in March 2019, nothing material happened during the first two events. The outcome in this case turns primarily on what occurred in the latter three events in June, July, and November 2019.

### A.   January 2019

ERI produced a "Written Warning" for unacceptable behavior dated January 16, 2019. The warning is of questionable provenance. Mr. Wolf testified that he prepared it, but does not recall providing it to Mr. Byrd, whose name is printed on the form but who did not sign it. It reports "[f]requent outbursts creating [an] awkward & stressful environment for colleagues." (Def. Ex. 1). At the bottom, it also reports, "Vance regularly challenges the authority of management in a loud disrespectful way. He told me he was sent by God to tell me that I wasn't being fair to an associate." (*Id.*). Mr. Byrd said that he never saw that warning. The court concludes that, at best, Mr. Wolf prepared the document and put it in Mr. Byrd's folder at the warehouse, but never forwarded it to upper management and never discussed it with, or even showed it to, Mr. Byrd.

### B.   March and April 2019

In or around March 2019, Mr. Byrd learned that Mr. Wolf had given a white employee a key to the building but had not given one to other equally deserving African-American employees. Some of Mr. Byrd's coworkers were upset and believed this was a racist act. On March 4, Mr. Byrd took it upon himself to bring these concerns directly to Mr. Wolf. He did not believe that Mr. Wolf

3

was racist and expected him either to address the concerns or assure him that his decision had nothing to do with race. When Mr. Byrd went to Mr. Wolf's office and told him of the grievance, Mr. Wolf instead said, "I don't care." Mr. Wolf testified that he said only that he did not care if Mr. Byrd thought he was racist, which is consistent with his position that he normally didn't pay much attention to Mr. Byrd, who was always going on about something, and would likely have dismissed Mr. Byrd's complaints.

Mr. Byrd felt betrayed by Mr. Wolf's reaction, lost trust in him, and concluded he was a racist. On March 18, Mr. Byrd filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination by Mr. Wolf. On April 4, however, the agency closed the charge and sent a notice to ERI. (Def. Ex. 10). An email notice also went to the ERI home office in New Jersey, which forwarded the information to Mr. Wolf on April 8.

Mr. Byrd testified that he told Mr. Wolf on April 2 that he'd complained to the EEOC and that Mr. Wolf said on April 3 not to bother coming in to work if he'd gone to the EEOC. Mr. Byrd also stated that Mr. Wolf docked his pay on April 3. Mr. Wolf denied that he knew about Mr. Byrd's EEOC charge before April 8 and denied ever threatening Mr. Byrd or docking his pay. The court discounts

4

Mr. Byrd's testimony, concluding that Mr. Wolf was not aware of the filing of the complaint until April 8.

### C. June 2019

On June 25, Mr. Byrd filed a complaint in this court. The same day, he had another encounter with Mr. Wolf. Another African-American employee was smoking a cigarette in the break area, which was against company policy. Mr. Wolf discovered him, told him his conduct was improper, and took the cigarette away. When Mr. Byrd learned of the event, he went to Mr. Wolf's office and confronted him. He told Mr. Wolf that taking the cigarette out of the other employee's hand had been disrespectful. Mr. Byrd also said that the cigarette was his. Mr. Wolf gave Mr. Byrd a dollar, thinking that repayment for the cigarette would end the matter.

Mr. Wolf prepared a Written Warning on June 27, in coordination with Ta Chen Human Resources ("HR") personnel, and presented it to Mr. Byrd on July 1. The warning listed deficiencies including misuse of company time, unacceptable behavior, violation of safety rules, insubordination, and failure to obey company rules. The narrative reads:

> On 6/25/19 the Warehouse Manager counseled another employee about smoking a cigarette in a[n] unauthorized area during work time (a safety violation). You argued with the Warehouse Manager in a loud and disrespectful manner, interfering with the Manager in the performance

5

> of his duties.  Additionally, you said th[at] the
> cigarette belonged to you, and that you were sharing
> [the] cigarette with the other employee, which means you
> were complicit in his smoking in an unauthorized area,
> if not in fact doing so yourse[lf] as well.  This is not
> the first time you have been . . . insubordinate towards
> the Manager or interfered with the work of others.  Be
> warned that further such interference or insubordination
> could result in your termination.

(Def. Ex. 2).  Mr. Wolf's testimony characterized Mr. Byrd as having "stormed" into his office and "belligerently" telling him that he had no right to take the cigarette.  Mr. Byrd testified that he received the warning but denied that he signed it.

### D.  July 2019

Mr. Wolf issued another Written Warning to Mr. Byrd on July 18, which Mr. Byrd signed, arising from incidents on July 16 and 17.  The warning states that on July 16:

> I was escorting a woman (a sales representative
> from a cleaning service), through the check-in office
> area.  She was taking measurements for a proposal she is
> preparing to provide cleaning services.  Vance addressed
> me, in her presence, in a gruff, aggressive tone, and
> asked, "What's she doing?  What's she doing?"[] I
> replied, telling Vance it was none of his concern.  As
> we entered the large restroom off the check-in office,
> he continued, in the same aggressive tone, audible to
> both the woman and myself, "(is) she going to clean the
> bathroom?  We'll see about that[.]"  This behavior is
> absolutely unacceptable, reflecting badly on the
> warehouse staff, and on the company as a whole.

(Def. Ex. 3).  Mr. Wolf testified that the female vendor was visibly upset by Mr. Byrd's conduct, particularly when he said

"we'll see" about whether she would do any cleaning.  At trial, Mr. Byrd admitted he had been "grumpy" that day due to an ear infection, felt intimidated by the cleaning vendor, and addressed her.  He denied, however, that his tone was gruff or aggressive.

The following morning, July 17, the warning states:

> Vance addressed me in an insubordinate fashion, saying, ["]Are you going to open the door?? []Are you going to open the door??"  When I reprimanded him and instructed him to go home without clocking in, he defied my instructions.  After reiterating my instructions, I told him that I was going to have to call the police if he continued to defy my instructions, to which Vance replied, "Call the police, because that is the only way I am leaving[.]"

(Def. Ex. 3).  Mr. Byrd was sufficiently agitated that another employee tried to calm him down.  Mr. Byrd did not dispute these facts.  He testified that he normally waited outside the employee entrance for Mr. Wolf to unlock the door and, on this occasion, he just walked by him.  Mr. Wolf testified that he'd told Mr. Byrd that, even though he could arrive at 7:30 a.m., he might not be able to open the door for him at exactly the same time each day.  Mr. Byrd also admitted that this was one of many instances that Mr. Wolf told him to go home and he refused.

   **E.   November 2019**

On November 20, Mr. Wolf presented employees with anti-discrimination and anti-harassment policies.  The employees were

7

asked to come to a conference room where they were given a copy of the policies and were asked to sign a form acknowledging that they had received the copies.  Mr. Byrd refused to come to the conference room.  He connected the word "discrimination" with this lawsuit, said he was not signing anything, and stormed out.  Mr. Wolf conferred with Ta Chen HR before telling Mr. Byrd to punch out and go home.  Mr. Byrd refused.  Mr. Wolf told Mr. Byrd that he would call the police, and Mr. Byrd said, "Go ahead."  Mr. Wolf called the police, clocked Mr. Byrd out, and emailed Ta Chen HR to report what was happening.  (Def. Ex. 5).  The police arrived, and Mr. Byrd left, seemingly pleased with what happened.  In the process, Mr. Byrd called Mr. Wolf a racist.  Later that afternoon, Mr. Byrd's employment was terminated and he was instructed not to return to the warehouse.  (Def. Ex. 6).

ERI and Mr. Wolf said that they fired Mr. Byrd because of his pattern of insubordinate behavior over the course of 2019, culminating in the incident on November 20.  Both in his communications to his superiors and at trial, Mr. Wolf said that Mr. Byrd's behavior across this period was often unsettling and caused stress for other employees.  Mr. Byrd argued that the warnings and his termination were retaliation for filing his EEOC charge and this lawsuit.  He justified his behavior as necessary

8

resistance in the face of a retaliatory campaign. He admitted that, after he filed the EEOC charge, he *expected* Mr. Wolf and ERI to retaliate against him. Mistrusting their motives, he challenged their every action and direction.

**II. Title VII**

"Title VII is central to the federal policy of prohibiting wrongful discrimination in the Nation's workplaces and in all sectors of economic endeavor." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013). One aspect of its protections is to bar retaliation based on an employee's opposition to conduct otherwise made unlawful by Title VII or for participation in a Title VII investigation or proceeding. 42 U.S.C. § 2000e-3(a).

Title VII, however, "does not set forth a general civility code for the American workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation omitted). "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* Neither "personality conflicts" nor "snubbing by supervisors and co-workers" will entitle an employee to Title VII's remedies. *See id.* (internal quotation marks omitted) (quoting 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3<sup>d</sup> ed. 1996)).

"A successful Title VII retaliation claim has three elements: (1) engagement in protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the adverse employment action." *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F.App'x 209, 212 (4th Cir. 2017) (unpublished) (citing *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005)).

**A.    Protected Activity**

Title VII protects two types of employee activity: participation and opposition. *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019) (citation omitted). The scope of these protected activities "should be interpreted broadly" because the antiretaliation provision "has the critical purpose of maintaining unfettered access to [the Act's] statutory remedial mechanisms for addressing discrimination." *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018) (internal quotation marks omitted) (citing *Burling N.*, 548 U.S. at 67; *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)).

Participation includes "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998)

(citing 42 U.S.C. § 2000e-3(a)).  Opposition encompasses a wide range of conduct including "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities."  *Id.* (citation omitted).

Participation is provided "absolute protection" even when it is "plainly unreasonable or irrelevant."  *Netter*, 908 F.3d at 937 (quotation omitted).  In other words, an employee only needs evidence that he filed a charge of discrimination, for example, to prove that he engaged in protected activity.  By contrast, opposition receives "qualified protection."  *Id.*  "[F]or an employee's activity to constitute protected 'opposition,' [he] must show (1) that [he] reasonably believed that the employment action [he] opposed constituted a Title VII violation, and (2) that [his] conduct in opposition was reasonable[.]"  *Id.* at 937-38 (internal citations omitted).

Mr. Byrd clearly engaged in protected activity.  ERI argues that Mr. Byrd's complaints to Mr. Wolf did not constitute protected opposition activity.  Mr. Byrd, however, relies on his participation conduct and not mere opposition conduct.  He filed a charge of discrimination with the EEOC in March 2019 and he filed this lawsuit in June 2019.  Both actions constitute participation

11

in a proceeding under Title VII and Mr. Byrd need not prove that either was founded on a reasonable belief that ERI had discriminated against him.

### B.   Adverse Action

"The [Title VII] antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N.*, 548 U.S. at 67. Unlike for discrimination claims, a plaintiff need not prove that his employer took an "ultimate employment decision[.]" *Darveau v. Detecon, Inc.*, 515 F.3d 334, 341-42 (4th Cir. 2008).  Rather, he must show a materially adverse employment action, meaning that the "employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 57, 68-69 (describing this determination as an objective standard).  Mr. Byrd certainly suffered a materially adverse employment action because he was terminated.  ERI's disciplinary written warnings may also qualify because they threaten termination.

### C.   Causation

A Title VII plaintiff must prove that his "protected activity was a but-for cause of the alleged adverse action[.]" *Nassar*, 570 U.S. at 362.  Only the ultimate question of whether Mr. Byrd has

12

met this burden is left, and the *McDonnell Douglas* framework "is no longer relevant," because ERI produced evidence of a legitimate reason for its actions. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993).  A plaintiff may prove a Title VII retaliation claim "through direct and indirect evidence of retaliatory animus[.]" *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (citation omitted).

Direct evidence of causation "encompasses conduct or statements that both (1) reflect directly the alleged [retaliatory] attitude, and (2) bear directly on the contested employment decision." *Johnson v. UPS, Inc.*, 839 F.App'x 781, 783 (4th Cir. 2021) (unpublished) (alteration in original) (quoting *Laing v. FedEx Corp.*, 703 F.3d 713, 717 (4th Cir. 2013)).  There are at least three types of indirect evidence of causation: temporal proximity, recurring retaliatory conduct, and inconsistent, false, or mistaken employer reasons for adverse actions.  *Id.* at 783-84 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001); *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007)); *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-48 (2000).  Whatever evidence a plaintiff offers, he must prove that the relevant decision-maker

13

knew about his protected activity.  *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021).

Here, Mr. Wolf knew about Mr. Byrd's EEOC charge and this lawsuit.  He was put on notice close in time to, but not immediately before, Mr. Byrd's written warnings and termination.  Mr. Wolf did not learn of the filing of the EEOC charge until April 8, 2019, after it was dismissed, and two and a half months before the June warning.  Mr. Wolf did not learn of the lawsuit until he was served, which the court file reflects was on October 10, 2019, one month before Mr. Byrd was fired.[2]  (ECF No. 12, at 6).  Mr. Byrd testified that he told Mr. Wolf about the lawsuit on June 25.  Both can be, and are, true.  Mr. Byrd likely did tell Mr. Wolf that the suit was filed, but Mr. Wolf was not listening.

Mr. Byrd has not proved any evidence of causation other than temporal proximity.  Contrary to Mr. Byrd's testimony, Mr. Wolf did not tell Mr. Byrd that he should not show up to work if he complained to the EEOC.  Outside that testimony, there is no evidence that Mr. Wolf was animated at all by the EEOC charge,

---

[2] The court file contains an earlier purported return of service on August 19, 2019, by Mr. Byrd personally.  (ECF No. 8, at 1).  That service was ineffective and had to be redone.  For purposes of this case, it does not matter whether Mr. Wolf received the suit papers on August 19 or on October 10.

which was dismissed before he knew it had been made, or by the lawsuit. Although Mr. Byrd assumes that ERI must have retaliated against him when it issued the written warnings and fired him, the better explanation is the one ERI offers. It disciplined and fired Mr. Byrd because of his repeated insubordinate behavior over at least the summer and fall of 2019.

Although Mr. Wolf tolerated Mr. Byrd's rather abrasive personality for many years, he informally noted the difficulties it caused in the workplace and, frankly, tried to ignore it. Once faced with the requirement to be more formal in his supervision, Mr. Wolf had to step up his oversight. Unfortunately, this increase in supervision coincided with the March incident and filing of the EEOC charge. If anything, Mr. Byrd escalated the problem by assuming that any criticism or unwanted attention was retaliation for filing the EEOC charge and, in response, resisting even more vocally and forcefully. The written warnings were well earned. Mr. Byrd, always somewhat disrespectful, became unmanageable. Still, Mr. Wolf went no further than warning Mr. Byrd until the November incident when the police had to be called.

Mr. Byrd was entitled not to be retaliated against for attempting to remedy workplace discrimination. But he was not entitled to misbehave in the workplace or to create disturbances

15

that disrupted the tranquility there. An employee who has complained cannot disregard supervisors' instructions, *Darvishian v. Geren*, 404 F.App'x 822, 824, 828-29 (4th Cir. 2010) (unpublished), or behave so disruptively that it causes colleagues emotional or physical distress, *Pritchard v. Metro. Wash. Airports Auth.*, No. 19-2386, 2021 WL 2026679, at *1-2 (4th Cir. May 21, 2021) (unpublished). *See also Calhoun v. U.S. Dep't of Labor*, 576 F.3d 201, 214 (4th Cir. 2009) (holding an employee's "continued failure to follow supervisors' instructions" was a legitimate non-retaliatory reason); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989) (holding an "insubordinate attitude" and "difficulty in working with fellow employees" were legitimate non-discriminatory reasons). Nor can he immunize "insubordinate, disruptive, or nonproductive behavior" by arguing that it was undertaken to oppose unlawful practices. *Armstrong v. Index J. Co.*, 647 F.2d 441, 448 (4th Cir. 1981).

Unfortunately, Mr. Byrd's already marginal behavior got worse after he lost trust in Mr. Wolf because of the March incident. But for his own behavior, Mr. Byrd would not have been disciplined or fired. Mr. Byrd has not proven that ERI's actions, either the warnings or the termination, were caused by his Title VII activity.

16

**III. Conclusion**

For the foregoing reasons, the court finds that ERI did not violate Title VII when it issued warnings to and fired Mr. Byrd in 2019.  Judgment will be entered for Defendant.

/s/
DEBORAH K. CHASANOW
United States District Judge
